720 F.2d 564
 Bernard PUNIKAIA, David Brede, Frank Duarte, Mary Duarte,
Clarence Naia, Francis Palea, Bernice Pupule and
Richard Pupule, et al., Plaintiffs- Appellants,
v.
Charles G. CLARK, Director of the Department of Health for
the State of Hawaii, individually and in his
official capacity, Defendant-Appellee.
 No. 82-4189.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted May 10, 1983.
Decided Sept. 7, 1983.
 
 Sidney M. Wolinsky, San Francisco, Cal., for plaintiffs-appellants.
 Michael A. Lilly, First Deputy Atty. Gen., Honolulu, Hawaii, for defendant-appellee.
 Appeal from the United States District Court for the District of Hawaii.
 Before BROWNING, Chief Judge, and WRIGHT and WALLACE, Circuit Judges.
 WALLACE, Circuit Judge:
 
 
 1
 Ten leprosy patients (the patients), some of whom live at the Hale Mohalu leprosarium near Honolulu, sued to enjoin the State of Hawaii from closing that facility. The patients claim that a variety of state and federal statutes, regulations, written contracts, and customs, create both a property and liberty interest in the form of a legitimate entitlement to continued medical care and residence facilities at Hale Mohalu. They contend that this entitlement prohibits the state from closing the facility, or alternatively, that it requires the state to provide them with a hearing before closure. The district court found that the patients possessed no legitimate entitlement and granted summary judgment in favor of the state. We affirm.
 
 
 2
 * Because there was a dispute on the factual issue of residency, for purposes of this appeal we assume that the patients are residents of both the state leprosarium at Kalaupapa on the island of Molokai and the residential facility at Hale Mohalu on the island of Oahu. The latter facility was established on federal land in the 1940s to enable Kalaupapa residents who needed sophisticated medical care to live near the Honolulu hospitals where expensive equipment and better medical care were available. In 1956, the federal government conveyed the land on which Hale Mohalu is situated to the State of Hawaii on condition that the state use the land for a leprosarium and that it maintain the Hale Mohalu facility, subject to a twenty-one year right of reentry. Brede v. Director for the Department of Health, 616 F.2d 407, 409 (9th Cir.1980) (Brede ). Although the facility was permitted to deteriorate somewhat, the federal government did not utilize its right to require maintenance. In March 1977, both the federal government's right of entry and the conditions contained in the quitclaim deed expired, and the state's title to Hale Mohalu became absolute. Id. at 409-10.
 
 
 3
 Due to the dilapidated and unsafe conditions of the buildings at Hale Mohalu, and for economic reasons, the state subsequently sought to close the facility and move the residential and medical support services to Leahi Hospital in Honolulu. On January 26, 1978, Hale Mohalu was closed officially. Those living there were permitted either to transfer to Leahi Hospital or to return to the leprosarium at Kalaupapa.
 
 
 4
 Although Leahi Hospital apparently is more modern and in better condition than Hale Mohalu, some residents felt uncomfortable moving from the older facility and chose to remain at Hale Mohalu. The state continued to provide these patients with basic services, such as water, electric power, telephone service, food, medical care, and supplies until September 1, 1978, when all services were terminated.
 
 
 5
 On September 5, 1978, the patients obtained a temporary restraining order from the district court compelling the state to restore all services, and sued to enjoin the state from closing Hale Mohalu. On September 21, 1978, the district court denied the patients' motion for a preliminary injunction and dismissed their complaint for lack of standing and for failure to state a claim upon which relief may be granted. We reversed, stating that the patients had "raise[d] the possibility that they ha[d] a property interest in the form of a legitimate entitlement to continued medical care and residence facilities at the Hale Mohalu leprosarium, which interest may not be deprived without due process." Id. at 410. We specifically identified two possible sources of such an entitlement: (1) Medicaid regulation, 42 C.F.R. Sec. 449.12(a)(1)(ii)(B)(4) (1977), and (2) the possibility that transfer of Hale Mohalu services to Leahi Hospital could impose a severe hardship on patients. We found, however, the record inadequate to determine whether an entitlement existed under either of these theories, and whether, therefore, the state was required to provide the patients with a pretermination hearing. We remanded the case to the district court. Id. at 410-12.
 
 
 6
 On remand, the patients filed an amended complaint alleging additional causes of action. The patients' motion for a temporary restraining order and preliminary injunction was denied by a second district judge. On appeal, we filed an unpublished order again remanding to the district court to hold an evidentiary hearing and make a new determination on the issuance of a preliminary injunction.
 
 
 7
 After this remand, the case was heard by a third district court judge. The patients moved for partial summary judgment based on their due process claims. The district judge denied the motion and sua sponte entered summary judgment in favor of the state. We then dismissed the appeal of the preliminary injunction as moot. We now decide the patients' appeal of the district court's denial of a permanent injunction.
 
 II
 
 8
 As we stated in Brede, to establish a property interest in receiving medical care at the Hale Mohalu facility, the patients must demonstrate that they possess more than a "unilateral expectation" of continued service. Id. at 410, quoting Board of Regents v. Roth, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972); see also Perry v. Sindermann, 408 U.S. 593, 601, 92 S.Ct. 2694, 2699, 33 L.Ed.2d 570 (1972). The source of the patients' claim of entitlement must be "the acts of the sovereign, state or federal, manifested in legislation, rules, or customs." Brede, 616 F.2d at 410, quoting Moore v. Johnson, 582 F.2d 1228, 1233 (9th Cir.1978).
 
 
 9
 The patients' primary claim is that a series of Hawaii statutes pertaining to the treatment of leprosy patients confers the necessary entitlement to treatment at Hale Mohalu whether or not a hearing is granted. We have already dealt with this issue in Brede. We concluded that although "[t]he state ha[d] statutorily conferred upon leprosy patients an entitlement to treatment at some state leprosarium ... [t]aken together, these statutes appear to authorize patient transfers 'at will' and therefore the Hale Mohalu residents would enjoy no more than a 'unilateral expectation' to continued services at that facility." 616 F.2d at 411 (footnote omitted). The patients argue that our use of the word "appear" indicates that we did not decide this question definitively; moreover, they argue, they are now citing statutory provisions that were not cited to the court in Brede. They are wrong. Taken in context, we indicated that the statutory scheme was not crystal clear but we held what the statutes appeared to us to mean. Our phraseology does not diminish the finality of our holding. We need not reexamine our holding but even if we did so, we would not depart from Brede.
 
 
 10
 Although the question whether patients possess a property or liberty interest is governed by federal constitutional law, the preliminary question whether a state statutory scheme substantively limits the state's discretion or permits it to act "at will" is one of state law. Memphis Light, Gas & Water Division v. Craft, 436 U.S. 1, 9-11, 98 S.Ct. 1554, 1560-1561, 56 L.Ed.2d 30 (1978). The statutes and regulations cited by the patients ensure that leprosy patients will receive treatment at some state leprosarium, Hawaii Rev.Stat. Sec. 326-1 (1976 & Supp.1982), that patients at Hale Mohalu will receive treatment equal to that received by patients at Kalaupapa, id. Sec. 326-2, that patients at Kalaupapa will be permitted to transfer to Hale Mohalu and vice versa, id. Sec. 326-11, that the residents of Kalaupapa may remain there for the rest of their lives, id. Sec. 326-40 (Supp.1982), and that patients will not be transferred from one hospital to another without their consent. Hawaii Public Health Reg. 27-6. The district court found, however, that these various statutory provisions were superseded by Hawaii Rev.Stat. Sec. 326-3 (1976 & Supp.1982), which states that "[n]otwithstanding any of the provisions of ... chapter or of any other chapter relating to [the treatment of leprosy patients]," the Department of Health is authorized to make arrangements for the care and treatment of leprosy patients.
 
 
 11
 Based on his reading of the statutes and analysis of their legislative history, the district judge concluded that the state had complete discretion to close Hale Mohalu and transfer its patients to alternative facilities. Thus, he reached the same conclusion as we reached in Brede. Two other Hawaii district court judges and an Hawaii State Circuit Court judge also have reached the same conclusion.[1] The interpretation of Hawaiian law by these Hawaiian judges is not clearly wrong. Jablonski v. United States, 712 F.2d 391 at 397 (9th Cir.1983). The patients have failed to establish an entitlement to continued treatment at Hale Mohalu based on the Hawaii statutes.
 
 III
 
 12
 We turn next to the two possible sources of entitlement specifically mentioned in Brede. 616 F.2d at 410-12. First, we concluded in Brede that the patients' "entitlement to treatment at some facility requires a measure of due process protection which may not have been provided in this case." Id. at 411 (emphasis in original). We stated that where patients are entitled to care provided by the state, "[t]he state may not act so as to reduce these services to the point of imperiling life or imposing other severe hardship without affording the recipients a pretermination hearing." Id. at 412. We concluded that such "severe hardship" would exist if the patients could demonstrate that the closing of the Hale Mohalu facility and the proposed transfer would cause "transfer trauma." We remanded the case to the district court because the record was unclear as to the extent to which the leprosy patients resisting transfer to the Leahi Hospital would suffer transfer trauma. Id.
 
 
 13
 The state argues that the district judge found on remand that the patients at Hale Mohalu would not suffer transfer trauma by moving to Leahi Hospital or back to Kalaupapa. The state admits, however, and the record reveals that the transfer trauma issue was disputed before the district court. Thus, it cannot be the basis for affirming the district court's grant of summary judgment. State ex rel. Edwards v. Heimann, 633 F.2d 886, 888 (9th Cir.1980); Fed.R.Civ.P. 56(c). The question is whether we can uphold the judgment when we specifically instructed the district court to make a factual finding as to the transfer trauma phenomenon, see Brede, 616 F.2d at 410, 412, and the district court did not do so.
 
 
 14
 Since Brede, the Supreme Court decided O'Bannon v. Town Court Nursing Center, 447 U.S. 773, 100 S.Ct. 2467, 65 L.Ed.2d 506 (1980) (O'Bannon ). There, the Supreme Court held that nursing home patients' interest in receiving care at a particular facility was insufficient to entitle them to a hearing prior to decertification of that facility by either the federal or state government. The Court recognized that decertification would result indirectly in the transfer of the nursing home's patients. It also assumed "for purposes of [the] decision that there is a risk that some residents may encounter severe emotional and physical hardship as a result of a transfer." Id. at 784 n. 16, 100 S.Ct. at 2475 n. 16. Nevertheless, the Court distinguished governmental action which results indirectly in transfers of patients from direct transfers of particular patients or reductions in their benefits. The Court stated:
 
 
 15
 Although decertification will inevitably necessitate the transfer of all those patients who remain dependent on Medicaid benefits, it is not the same for purposes of due process analysis as a decision to transfer a particular patient or to deny him financial benefits, based on his individual needs or financial situation.
 
 
 16
 Id. at 786, 100 S.Ct. at 2475. The Court reasoned that in decertifying a facility the government confers an indirect benefit by ensuring safer facilities for all nursing home residents. Such governmental enforcement action may have an indirect adverse impact on residents of the affected facility, but such impact does not amount to a deprivation of any interest in life, liberty, or property. Id. at 786-88, 100 S.Ct. at 2475-76.
 
 
 17
 O'Bannon is not direct authority because it involved the decertification of a private facility by the government, not a state's closing of its own facility. Nevertheless, we find that O'Bannon controls the disposition of this case. The state's decision to close the hospital for safety and economic reasons is closely analogous to the government's decertification of a private hospital for failure to maintain minimum health and safety standards. Due process does not require us to impede the state's ability to provide safe facilities and to make economically sound decisions which will allow it to provide the best treatment for the greatest number of patients. Moreover, since the state has continued to provide for leprosy patients by permitting them to transfer to the modern and well equipped Leahi Hospital, or return to Kalaupapa where they are currently registered, the state has not reduced the patients' benefits. Thus, under the reasoning of O'Bannon, the patients do not have an entitlement to services at Hale Mohalu.
 
 
 18
 The patients attempt to distinguish their case from O'Bannon, citing Yaretsky v. Blum, 629 F.2d 817 (2d Cir.1980), rev'd on other grounds, 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982) (Yaretsky ). The Second Circuit there held that Medicaid patients' interest in avoiding the effects of transfer trauma is a constitutionally protected liberty interest where such trauma results from the transfer of a patient from a lower to a higher level of care within existing Medicaid nursing homes. Id. at 821. Yaretsky, however, involved direct transfers of particular patients between existing facilities, not indirect transfers resulting from a decision to decertify or close a facility. Id. at 819. Thus, even assuming the soundness of the Second Circuit's reasoning, the case is not applicable.
 
 
 19
 Turning to the second possible source of entitlement explicitly mentioned in Brede, we stated that if Hale Mohalu qualified as a Medicaid "intermediate care facility" the leprosy patients would have a "legitimate entitlement to continued residency at the [facility] of [their] choice." Brede, 616 F.2d at 410-11, quoting Klein v. Califano, 586 F.2d 250, 258 (3d Cir.1978). This conclusion was based on our interpretation of 42 C.F.R. Sec. 449.12(a)(1)(ii)(B)(4) (1977), which limits the reasons for which a patient in a Medicaid "intermediate care facility" may be transferred. See Brede, 616 F.2d at 411 n. 4. The district judge on remand concluded that these regulations would not apply because Hale Mohalu was not an "intermediate care facility," but a "skilled nursing facility."
 
 
 20
 We need not discuss this asserted difference between types of facilities because we are foreclosed from following our own suggestion in Brede due to the Supreme Court's decision in O'Bannon. In O'Bannon, the Court held that 42 C.F.R. Sec. 405.1121(k)(4), which applies to skilled nursing facilities and which is identical to 42 C.F.R. Sec. 449.12(a)(1)(ii)(B)(4) in all relevant respects, does not give rise to an entitlement to continued care at a particular facility. 447 U.S. at 780 & n. 9, 785-88, 100 S.Ct. at 2473 & n. 9, 2475-76. Although the regulations limit the ability of Medicaid facilities to transfer patients, such limits are not applicable to transfers indirectly resulting from decertification of a facility. Id. at 786-88, 100 S.Ct. at 2475-76. The same reasoning applies to the closing of a facility.
 
 
 21
 Thus, the patients failed on remand to establish an entitlement under either of the two possible bases we set out in Brede.
 
 IV
 
 22
 The patients next suggest a variety of other possible sources for an entitlement to continued care at Hale Mohalu. The state argues that we are foreclosed by Brede from considering any of these further arguments. It interprets our language in Brede that "appellants raise a number of issues, most of which are without substantial merit," 616 F.2d at 410, as a rejection of any arguments other than the two we have just considered. The patients argue that this passage refers to other claims made to the court in Brede which were abandoned following our decision in that case. Since we did not make clear which claims were "without substantial merit," we will consider the patients' remaining entitlement claims presented in this appeal.
 
 
 23
 The patients first contend that the government may not terminate utilities and other essential services without first granting residents a notice and a hearing, citing Memphis Light, Gas & Water Division v. Craft, 436 U.S. 1, 98 S.Ct. 1554, 56 L.Ed.2d 30 (1978). But in that case, the Supreme Court based its determination of an entitlement to continued utility service on state law which prohibited the utility company from terminating services "except for good and sufficient cause." Id. at 11, 98 S.Ct. at 1561. The patients cite no Hawaii statute similarly limiting the Board of Health's power to terminate utility services.
 
 
 24
 The patients argue, however, that even without an entitlement based on state law, Brede forbids the state from creating a life-threatening situation by cutting off utilities. They rely upon our statement that given the patients' right to at least some care provided by the state, the state could not "act so as to reduce ... services to the point of imperiling life or imposing other severe hardship without affording the recipients a pretermination hearing." 616 F.2d at 412. This language, however, refers to the transfer trauma phenomenon, not to whether a hearing is required before a government may close one of its own facilities. Unlike the injuries resulting from transfer trauma, any life-threatening danger resulting from the state's termination of utility services was self-inflicted because the patients voluntarily remained after the facility was closed. If we were to accept the patients' analysis, an occupant of a government facility could remain, as a trespasser, despite the government's attempt to close the facility, and obtain a pretermination hearing on the theory that a termination of essential utilities would pose a life-threatening danger. We reject such an unprecedented interpretation of the due process clause. It was sufficient in this case that the state gave the patients notice before closing the facility and provided alternative facilities for them.
 
 
 25
 The patients cite Mathews v. Eldridge, 424 U.S. 319, 340, 96 S.Ct. 893, 905, 47 L.Ed.2d 18 (1976), and Goldberg v. Kelly, 397 U.S. 254, 260-63, 90 S.Ct. 1011, 1016-18, 25 L.Ed.2d 287 (1970), as authority for their claim. These cases state only that once a plaintiff has established a legitimate entitlement to a particular benefit, the degree of potential deprivation resulting from a particular decision is a factor which may be considered in determining whether he receives a hearing before or after termination of his benefits. Mathews v. Eldridge, 424 U.S. at 340, 96 S.Ct. at 905. Such cases are inapplicable because the patients have not demonstrated an entitlement to continued care at Hale Mohalu.
 
 
 26
 We also reject the patients' claim to an entitlement as a utility user based on Kaufman v. Abramson, 363 F.2d 865 (4th Cir.1966). The plaintiff's suit in that case was for damages under state law; the court did not find any entitlement which would require a pretermination hearing. We express no opinion as to whether the patients may have a cause of action for damages under state law for the state's termination of utility services on September 1, 1978.
 
 
 27
 The patients next claim a property interest under various Hawaii landlord/tenant laws, see Hawaii Rev.Stat. ch. 666 (1976 & Supp.1982), and public housing laws, see id. Secs. 360-2, 360-3. The district judge held that the patients were not "tenants" in a contractual sense under Hawaii law, and that Hale Mohalu could not be characterized as public housing; therefore, he held that the cited statutes were inapplicable. These interpretations of state law are not clearly wrong. The patients also cite cases from other circuits for the proposition that even absent statutory provisions, residents of public housing must be afforded a hearing prior to eviction. See Caulder v. Durham Housing Authority, 433 F.2d 998 (4th Cir.1970), cert. denied, 401 U.S. 1003, 91 S.Ct. 1228, 28 L.Ed.2d 539 (1971); Escalera v. New York City Housing Authority, 425 F.2d 853 (2d Cir.), cert. denied, 400 U.S. 853, 91 S.Ct. 54, 27 L.Ed.2d 91 (1970). Again, these cases are not relevant because the patients are not public housing tenants.
 
 
 28
 The patients next contend that the state's provision of continuous care at Hale Mohalu for thirty years constitutes a "custom" or "regularity of performance" creating more than a unilateral expectation in continued residency at Hale Mohalu. Custom may give rise to a legitimate entitlement. Brede, 616 F.2d at 410; Moore v. Johnson, 582 F.2d at 1233. Nevertheless, the state's continuous operation of Hale Mohalu over several years cannot be characterized as a "custom" which generates a property interest. Otherwise, the government could never close an institution which it has maintained for a long time without granting a pretermination hearing for the individual residents of that institution. Such restriction on governmental action is not required by the due process clause. See Connecticut Board of Pardons v. Dumschat, 452 U.S. 458, 465, 101 S.Ct. 2460, 2464, 69 L.Ed.2d 158 (1981) ("A constitutional entitlement cannot 'be created--as if by estoppel--merely because a wholly and expressly discretionary state privilege has been granted generously in the past.' ", quoting Leis v. Flynt, 439 U.S. 438, 444 n. 5, 99 S.Ct. 698, 701 n. 5, 58 L.Ed.2d 717 (1979) (per curiam)); see also O'Bannon, 447 U.S. at 785 n. 17, 100 S.Ct. at 2475 n. 17 (dicta).
 
 
 29
 Although they have been unable to establish an entitlement under any of the individual theories, the patients claim, without citing any authority, that the combination of state statutes, custom, contractual obligations, and state regulations, taken together, give rise to a property interest protectible under the fourteenth amendment. Such a theory was presented to and rejected by the Supreme Court in O'Bannon. 447 U.S. at 781 n. 12, 785, 100 S.Ct. at 2473 n. 12, 2475.
 
 
 30
 Turning from state to federal law, the patients claim an entitlement under 42 U.S.C. Sec. 247e which specifies that the Public Health Service must receive into a hospital "suitable for his accommodation" any person afflicted with leprosy. As the district judge correctly observed, however, this statute does not limit public health administrators' discretion to determine in which "suitable" facility a particular leprosy patient will be placed. Although section 247e may give rise to a private suit by a patient who claims that a particular facility is not a "suitable accommodation," it does not confer an entitlement to services at a particular facility.
 
 
 31
 The patients argue finally that they are entitled to continued residency at Hale Mohalu, whether or not a hearing is granted, as third-party beneficiaries of the quitclaim deed executed by the federal government to the State of Hawaii. The patients contend that the contract required the state to maintain a "permanent" leprosarium, that the provision has been violated by the state, and that their rights as third-party beneficiaries did not expire with the federal government's right of entry. Even assuming that the patients qualify as third-party beneficiaries, their argument fails. Although the deed requires that the state use the property for a leprosarium "on a permanent basis," and that the state maintain the buildings at Hale Mohalu, it also explicitly states that the conditions set forth in the deed, along with the right to re-enter, shall terminate and be extinguished twenty-one years following the date of the deed. Thus, the conditions terminated on March 23, 1977. Brede, 616 F.2d at 409 n. 2. The rights of a third-party beneficiary are limited by the contract between the promisor and the promisee. 4 A. Corbin, Contracts Secs. 810, 818 (1951); 2 S. Williston, Contracts Sec. 364A (3d ed. 1959). The parties intended the conditions and, hence, any rights to enforce those conditions, to expire in twenty-one years; third-party beneficiaries cannot exercise rights that the parties did not intend them to have.
 
 
 32
 In conclusion, because the patients have not demonstrated a legitimate entitlement to residence and continued services at Hale Mohalu, the due process clause does not require that they be granted a hearing before the state may close that facility. We therefore need not decide whether the patients were afforded sufficient notice and hearings to satisfy the fourteenth amendment.
 
 
 33
 AFFIRMED.
 
 
 
 [1]
 The patients brought suit in the Hawaii state court on January 20, 1978, six days before the closing of Hale Mohalu, seeking a temporary restraining order prohibiting the transfer of patients to Leahi Hospital. The state circuit judge denied the patients' motion for a preliminary injunction, stating that, "Section 326-3, Hawaii Revised Statutes, overrides other laws (including rules and regulations) and authorizes the Department of Health to make arrangements at Leahi Hospital for the care and treatment of any person within the state affected with leprosy."